**KESSLER, DIGIOVANNI & JESUELE, LLP**
**Vincent Jesuele, Esq.**
773 Central Avenue
P.O. Box 2429
Westfield, NJ 07091
(908) 232-2040
Attorneys for Plaintiff

**RECEIVED**

APR 2 3 2010

AT 8:30 _____ M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Plaintiff,

CLEO VAN DOREN, formerly CLEO
DOUGHERTY
vs.

Defendants,

CAPITAL RESEARCH AND
MANAGEMENT COMPANY D/B/A
AMERICAN FUNDS; TRADER JOE'S
COMPANY; PLAN COMMITTEE

CIVIL ACTION NO.: 2:10-CV-01425
2:10-CV-01460
SRC-MAS

AMENDED
COMPLAINT, JURY DEMAND,
DESIGNATION OF TRIAL COUNSEL

Plaintiff, residing at 66 Elm Street, Westfield, Union County, New Jersey, complaining of the defendants, states:

1. This Complaint is brought under, inter alia, **29 U.S.C.A. 1132 (a)(1)(B)**. Jurisdiction is based upon **29 U.S.C.A. 1132 (e)(1) and (2)**.

2. On and before May 29, 2008, plaintiff was a spousal beneficiary under defendant, Trader Joe's Company, Retirement Plan in the name of her then-husband, Timothy Dougherty. At the aforesaid time, the said account contained $173,980.00 in available funds.

3. At the aforesaid time, the account was being serviced and/or administered by Defendant, Trader Joe's and/or by defendant, Plan Committee, and/or by defendant,

Capital Research and Management Company, doing business as American Funds, (hereinafter "CRMC"). An agreement exists between Trader Joe's Company and CRMC, which agreement is annexed hereto as **Exhibit A**.

4. That said agreement provided that CRMC, as the "Service Provider" agrees to "perform the recordkeeping and administrative services specified in the attached Exhibit A", and also indicates that "the Service Provider's responsibilities shall be limited to those specifically listed in Exhibits A and B".

5. These services included, inter alia, "preparation of certified copy of the trust statement", "processing participant withdrawals at the employer's direction, including applicable federal withholding and mandatory state withholding", "preparation of Form 1099R, and withholding tax remittance and reporting", "preparation and maintenance of participant loan documents and processing of loan distribution", "processing name, address and other indicative data changes submitted by the employer", "maintenance of amounts eligible for participant loans and/or hardship withdrawals", "maintaining beneficiary information".

6. At the aforesaid time, Defendant, Trader Joe's Company, defendant, Plan Committee, and defendant, CRMC, were fiduciaries of the aforesaid plan pursuant to **29 U.S.C. 1002 (21)(A)** in that each exercised discretionary authority or discretionary control respecting management of the plan <u>or exercised any authority or control respecting management or disposition of its assets</u>. As such, each were required to use that degree of skill and care commensurate with their duties and obligations imposed by State and Federal law, including **29 U.S.C.A. 502** et. seq. and **29 U.S.C. 1104 (a)**.

7. On or about May 29, 2008, one or more of said defendants, independently or in

concert, distributed the entire value of the aforesaid account to Timothy Dougherty based upon his submission of a Distribution Request which indicated, falsely, that he was unmarried. One or more of Defendants were, or should have been, aware that a prior submission of Timothy Dougherty had indicated that he was married.

8. Defendant, CRMC, prepared and provided the withdrawal forms to Timothy Dougherty, on American Funds letterhead, which provide details and instructions on the distribution including, inter alia, the proviso that if the participant is married, the distribution must be by Qualified Joint Survivor Annuity ("QJSA") unless spousal notarized consent is obtained.

9. Despite the knowledge of defendants that Timothy Dougherty's prior submissions indicated that he was married, defendants accepted and processed the distribution forms indicating that he was single and distributed the entirety of Timothy Dougherty's plan assets to him to the exclusion of his wife.

10. Plaintiff was unaware of the distribution until late July 2009 when she was advised by a representative of Trader Joe's Company of the said distribution.

11. Plaintiff did not avail herself of the administrative remedies provided by the subject plan because the same would have been futile. The Claim Procedure outlined in the plan documents between pages 60-63, attached as Exhibit B, provides that "The claimant shall make a written application for benefits <u>under the plan</u>." However, when plaintiff learned of the distribution to her ex-spouse, there remained no funds in the plan as to her claimed interest, the entirety of the funds having been distributed some 14 months before. Accordingly, there were no "benefits under the plan" to claim, rendering the pursuit of such a claim futile.

12. Moreover, plaintiff asserts that defendants breached their fiduciary duties in distributing the entirety of Timothy Dougherty's account to him to the exclusion of his

then spouse, plaintiff, thus rendering administrative exhaustion unnecessary inapplicable under existing law.

13. Defendants acted negligently and in breach of their fiduciary duties and obligations when a distribution of the entire plan value was made to Timothy Dougherty to the exclusion of plaintiff, Cleo Van Doren, formerly Cleo Dougherty. Moreover, Defendants acted negligently in failing to ensure that the submission of Timothy Dougherty was accurate and truthful, especially in light of Timothy Dougherty's prior submissions to defendants indicating that he was married.

14. As a result of the aforesaid negligence and breach of fiduciary duties and obligations on the part of defendants, plaintiff was damaged and suffered a loss of the value of her 50% joint and survivor annuity and/or her equitable distribution share of the account value in addition to accrued growth; incurred legal costs and expenses in the prosecution of this matter and was otherwise damaged.

WHEREFORE, plaintiff demands judgment against defendants, jointly, severally or in the alternative, for damages incurred; civil penalties provided for under the applicable act; attorneys fees, costs of suit and interest.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Vincent Jesuele is hereby designated as trial counsel on behalf of plaintiff in the within matter.

KESSLER, DIGIOVANNI & JESUELE
Attorneys for Plaintiff

BY: Vincent Jesuele

# EXHIBIT A

Case 2:10-cv-01425-KSH -PS   Document 20   Filed 04/23/10   Page 5 of 19 PageID: 98

From:                                    01/29/2007 10:48    #412 P.006/013



Recordkeeping and
Administrative Services Agreement

This Recordkeeping and Administrative Services Agreement ("the Agreement") is entered into by the parties identified below as the Employer and the Service Provider. The Employer agrees to purchase, and the Service Provider agrees to provide certain services to the retirement plan or deferred compensation arrangement sponsored by the Employer and serviced by the Service Provider on the terms and conditions set forth below.

The Employer acknowledges that it has selected a fee-leveling arrangement from an array of fee-leveling and nonfee-leveling services arrangements. The Employer further acknowledges that it is entering into a fee-leveling arrangement to protect, among other things, against any perceived conflict of interest in selecting investments for its retirement plan.

## I. Definitions

**Authorized Signer**
Means any person designated by the Employer, in writing to the Service Provider, as authorized to provide Employer Instructions. If more than one person is designated as an Authorized Signer, the Service Provider may rely on any one such person to authorize a transaction, unless the Employer provides otherwise in writing.

**Billing Date**
Means the last business day of the first calendar quarter ending on or after the Services Start Date and the last business day of each successive calendar quarter, including the Services Termination Date.

**Eligible Net Credit**
Means a net credit of one hundred dollars ($100.00) or more determined annually as of the Invoice Date for the fourth calendar quarter.

**Employer**
Means the legal entity that has established and maintains the Plan and that has executed the Agreement.

**Employer Instructions**
Means such information, provisions, guidelines, interpretations and instructions that are sent to the Service Provider by the Employer, the Authorized Signer or their agents, either in writing or in any electronic medium as the Service Provider may require to perform its services under the Agreement.

**ERISA**
Means the Employee Retirement Income Security Act of 1974, as amended, and regulations issued thereunder.

**Invoice Date**
Means the date that any net fees or credits are determined under this Agreement for each calendar quarter.

**Plan**
Means the retirement plan or deferred compensation arrangement that the Employer has established.

**Service Provider**
Means Capital Research and Management Company and any assignee or successor thereof.

**Service Year**
Means the one-year period beginning on the Services Start Date and each successive one-year period (or less in the event of termination of the Agreement).

**Services Start Date**
Means the first business day upon which Plan asset records are maintained on the recordkeeping system of the Service Provider.

**Services Termination Date**
Means the last business day of the calendar quarter that coincides with or follows the later of: (1) the 60th day after the receipt of the written notice referred to in Section XI of the Agreement, or (2) the date upon which there are no Plan asset records maintained on the recordkeeping system of the Service Provider.

**Trustee**
Means Capital Bank and Trust Company and any assignee or successor thereof.

## II. Services provided

The Service Provider agrees to perform the recordkeeping and administrative services specified in the attached Exhibit A with respect to the Plan. These services may be provided by affiliates or agents of the Service Provider and, to the extent so provided, such affiliates and agents shall have the full benefit of the Agreement. In addition, the Employer may select one or more of the ancillary services described in the attached Exhibit B.

All information, data and other materials furnished to the Service Provider by the Employer must be furnished in a form and format acceptable to the Service Provider. Plan contributions must be submitted using Automated Clearing House (ACH).

## III. Fees

**Calculation of fees**
As compensation for the Services provided under the Agreement, the Service Provider shall be entitled to fees as of the first day of each calendar quarter. Such fees shall be determined in accordance with the attached Exhibit B.

**One-time setup fee**
For start-up plans, payment of the applicable one-time setup fee reflected on the Fee Schedule in Exhibit B is nonrefundable and must accompany the Agreement. All other plans may elect to pay the applicable one-time setup fee within their first Service Year.

RECEIVED TIME   JAN. 29.   10:10AM



Recordkeeping and
Administrative Services Agreement

### Other fees
Other fees will be billed quarterly in arrears to the Employer on the Invoice Date and will be determined by reference to: (1) the Fee Schedule, using the number of participants with an account balance at any time during the calendar quarter that includes the Billing Date; (2) any ancillary fees shown in Exhibit B that are incurred by the Plan as of each Billing Date; and (3) the applicable credit rate shown in Exhibit B based on the American Funds share class used by the Plan.

A portion of the standard ongoing fees described in Exhibit B will be prorated for the number of calendar days from the Services Start Date to the initial Billing Date.

### Credits
Certain payments from the investment options held by the Plan are payable to the Service Provider and are used as a credit to offset fees payable by the Plan on the Invoice Date. Such a credit is determined using the credit rates shown in Exhibit B.

Except in the case of an Eligible Net Credit, any net credit as of an Invoice Date will be applied against the next calendar quarter's fees. As soon as reasonably practicable after the determination of an Eligible Net Credit, but no later than the March 31st following such determination, an Eligible Net Credit will be allocated among all participants with an account balance on the date of the allocation.

### Payment of fees
An invoice reflecting net fees payable or a net credit will be sent to the Employer by the Service Provider on the Invoice Date.

The Employer directs the Service Provider to rely on the representations made in Section IV of the Agreement in implementing the payment procedures provided for in this section. The Employer may elect to pay the amounts billed as follows:

- Consistent with the terms of the Plan, the Employer, in its capacity as Plan administrator or as another Plan fiduciary, may, by written Employer instructions, cause the Plan to pay the amounts billed. The Employer shall direct the Service Provider as to which expenses shall be deducted on a pro rata or a per capita basis from all participant accounts and which expenses shall be deducted only from a specific participant's account. The Service Provider is entitled to rely on such written Employer instructions that are received from time to time or that are specified as continuing directions until notified to the contrary in writing. Such written Employer instructions are subject to the requirements and limitations as may be imposed by the Service Provider.

- Consistent with the terms of the Plan, the Employer may itself pay the amounts billed. In the event, however, that any fees for Services remain unpaid for more than ninety (90) days after the Invoice Date, the Service Provider has not received written notice of a dispute, and the terms of the Plan permit the Plan to bear recordkeeping and administrative expenses, the Employer, in its capacity as Plan administrator or other Plan fiduciary, hereby irrevocably directs the Service Provider to deduct these Plan expenses from Plan assets. The Employer hereby further irrevocably directs the Service Provider to deduct general Plan expenses on either a pro rata or per capita basis from all participant accounts and specific Plan expenses applicable to a participant directly from a participant's account. Notwithstanding the Employer's irrevocable direction, the Service Provider may elect, in its sole discretion, to defer or waive the deduction of unpaid fees from Plan assets. Any such deferral shall not constitute a waiver, unless so specified in writing by the Service Provider. In the absence of such written waiver, the Plan shall remain liable for such unpaid fees unless paid by the Employer.

### Amendment of fees
The Service Provider may amend the Fee Schedule in Exhibit B upon ninety (90) days' written notice to the Employer, provided, however, that no such amendment will be effective during the first Service Year. Any such amendment will be effective as of the first day of the calendar quarter that next follows or coincides with the expiration of the 90-day notice period.

### Fees at Services termination
Upon notice of Services termination, an invoice for applicable fees through the Services Termination Date will be sent to the Employer by the Service Provider.

## IV. Employer representations and responsibilities

The Employer represents that: (1) it is authorized to enter into the Agreement on behalf of the Plan; (2) the Plan provides, or will be amended within ninety (90) days from the effective date of the Agreement to provide, that all reasonable Plan expenses of administration may be paid out of Plan assets unless paid by the Employer; (3) all Plan expenses, excluding any expenses related to Plan establishment, design or termination, constitute a liability of Plan assets until paid; and (4) all Authorized Signers have capacity to act on behalf of the Plan.

The Employer acknowledges that it is solely responsible for: (1) the tax and legal aspects of the Plan; (2) the Plan's operations; (3) the administration of the Plan; and (4) the selection and periodic review of Plan investments, including the right to add or remove investments made available to the Plan's participants. The Employer shall promptly furnish accurate and complete Employer

**American Funds**

Recordkeeping and
Administrative Services Agreement

---

Instructions to the Service Provider or its agent, as may be required by the Service Provider or its agent to perform services under the Agreement. The Service Provider shall be fully protected in relying on Employer instructions and shall have no responsibility to ascertain with respect to any Employer instructions, their accuracy, genuineness, compliance with the terms of the Plan, any related documents or applicable law, or their effect for tax purposes or otherwise.

The Employer acknowledges that if the Service Provider or its agent receives conflicting instructions from the Employer or a Plan participant, the Service Provider or its agent shall, without liability to any party, comply with the Employer instructions. Employer instructions must be sent to the Service Provider or its agent in a format acceptable to the Service Provider or its agent, as applicable. Additional charges will be assessed if certain data are provided in a nonautomated format. The Employer shall provide the Service Provider with a written update from time to time of all persons who are Authorized Signers.

If it is necessary for the Service Provider or its agent to reperform any portion of its services due to incorrect or incomplete information or instructions furnished by the Employer, the Service Provider will be entitled to charge an additional fee that will be due when billed. If it is necessary for the Service Provider to reprocess any fund transactions on an "as of" basis due to incorrect or incomplete information furnished by the Employer, the Service Provider will charge any losses paid by the Service Provider to the Employer. In addition, any processing costs incurred by the Service Provider or its agent may be charged to the Employer and will be due when billed.

If the Plan is not using the American Funds prototype document, the Employer acknowledges that upon Plan termination, an IRS determination letter will be obtained prior to the final distribution of Plan assets.

The Employer acknowledges that mutual fund dividends may be credited to the accounts of the Plan and Plan participants up to three (3) business days following the fund's payment date for such dividends.

## V. Service Provider responsibilities

The Employer acknowledges that the Service Provider is not responsible for the Plan's operations. The Service Provider's responsibilities shall be limited to those specifically listed in Exhibits A and B. The Service Provider shall have no other obligations or duties relating to the administration or operation of the Plan; these include but are not limited to:
- Interpreting Plan provisions
- Determining eligibility or vesting
- Determining hours of service
- Defining compensation
- Monitoring timeliness of contributions
- Determining the deductibility of any contributions
- Filing any returns and reports (not specifically agreed to under the Agreement) with the Internal Revenue Service or Department of Labor
- Obtaining a legal determination of the qualified status of any domestic relations order
- Any other duties for which the Employer is responsible in its capacity as "Plan Administrator," as that term is defined under ERISA
- The distribution to participants of proxy or tender offer information, the tabulation of proxy votes and responses to tender offers, and any other matters relating to proxy voting and tender offers with respect to any Plan investment

Nothing in the Agreement will be deemed to impose any obligation on the Service Provider to monitor, control, or in any way exercise any powers or discretion in the administration of the Plan or in the handling of any Plan assets, including but not limited to the selection, the acquisition or disposition of any funds, securities or other assets of the Plan. All services performed by the Service Provider shall be as an independent contractor to the Employer and not as an employee or agent of the Employer, the Plan, their agents or any trustee or named fiduciary. Neither the Service Provider nor any of its agents, affiliates, nor any officer, director or employee of the Service Provider or any agent or affiliate, shall have or be given any authority, control or responsibility that would render it, or otherwise cause it to be deemed to be, a "fiduciary" of the Plan or to "handle" or be in possession or control of "Plan assets" or "Plan records," in each case within the meaning of ERISA, by reason of entering into or acting in accordance with the Agreement.

The Employer acknowledges and agrees that the Service Provider is not responsible for: (1) any claim, regulatory proceeding or litigation arising from the Employer's operation of the Plan, including, but not limited to, consequences resulting from the Employer's direction to pay Plan expenses from Plan assets or to make various investment options available to the Plan's participants; and (2) any tax or other liability that may be imposed on the Employer, Plan, their agents, or any Plan participant, beneficiary, trustee or fiduciary.

## VI. Limitation of liability

The Service Provider and its agents and affiliates shall only be liable for direct damages solely and directly caused by the negligent acts of the Service Provider and its agents and affiliates, and shall not be liable for any other direct damages or for any



Recordkeeping and
Administrative Services Agreement

indirect, special, incidental or consequential damages suffered or incurred by the Employer, the Plan, their agents, the Trustee(s) or any other person. This provision shall survive the termination of the Agreement.

### VII. Acts beyond the control of the Employer or the Service Provider

Neither the Employer nor the Service Provider will be responsible for delays or failures in performance resulting from acts beyond its reasonable control. Such acts will include, but not be limited to, acts of God, natural disasters, equipment malfunctions and extraordinary trading volume on any stock exchange that disrupts trading on the exchange.

### VIII. Confidentiality of the Plan information

The Service Provider agrees that all Plan information and data, including Employer instructions, provided to the Service Provider by the Employer are confidential information of the Employer or the Plan. The Service Provider agrees not to disclose such confidential information to third parties except: (1) to its affiliates or agents for the purpose of providing to Plan participants services or information about the American Funds or an affiliate of the Service Provider; (2) in any administrative or judicial forum involving a dispute under the Agreement; (3) as may be required by law or by order of any government agency, regulatory body or court of competent jurisdiction for purposes other than those specified in the Agreement, without the prior consent of the Employer; or (4) for the limited purpose of collecting satisfaction surveys from the Employer and/or Plan participants from time to time.

The Employer agrees to use all necessary and appropriate measures to safeguard the confidentiality of any information, data or other material transmitted to the Service Provider (including, without limitation, any transmissions over the Internet) and to comply with such requirements for the transmission of data as may be established from time to time by the Service Provider.

### IX. Amendment and assignment

The Agreement may be amended or modified at any time by: (1) an instrument executed by the Employer and the Service Provider; or (2) the Service Provider upon sixty (60) days' written notice to the Employer, provided the Employer accepts the amendment by failure to object in writing in accordance with this section. A written objection must be sent to the address provided in Section XII of the Agreement and be received by the Service Provider within forty-five (45) days after the amendment's mailing date. The Service Provider may, however, amend the fee schedules in Exhibit B without the Employer's consent as provided under Section III of the Agreement. The Agreement may not be assigned by either party without the prior express written consent of the other party, except that the Service Provider may assign its rights and obligations under the Agreement to any affiliate of the Service Provider or any successor in interest to the Service Provider upon thirty (30) days' written notice to the Employer.

### X. Float disclosure

**Trustee float**

Upon the issuance of a check from the Plan's assets, no additional earnings will accrue to the Plan with respect to the uncashed check. Earnings on uncashed checks may accrue to the Trustee at a money market rate of return. Such earnings will accrue from the date upon which a check is mailed, one business day after the redemption or sale is processed, until the date upon which the check is presented for payment.

Float may also accrue to the Trustee on a one-time basis with respect to conversion assets wired to the Trustee. Earnings on such assets may accrue to the Trustee at a money market rate of return from the date of receipt of the wire until the investment settlement date.

**Service Provider float**

Float may accrue to the Service Provider with respect to net credits from the Invoice Date until either the first day of the next calendar quarter or, in the case of an Eligible Net Credit, the date the Eligible Net Credit is allocated among Plan participants. Earnings on any net credits may accrue to the Service Provider at a money market rate of return.

### XI. Term of Agreement

The Agreement will continue in effect and will automatically be renewed from Service Year to Service Year but may be terminated at any time with or without cause by the Employer upon sixty (60) days' written notice. The Agreement may be terminated immediately, at the option of the Service Provider, if the Employer: (1) fails to provide required information within thirty (30) days of a request; (2) fails to pay the applicable fees within thirty (30) days of the Invoice Date; or (3) makes an assignment for the benefit of creditors, files (or has filed against it) a petition under the bankruptcy laws of any jurisdiction, appoints (or has appointed for it) a trustee or receiver for its property or business, or is adjudicated bankrupt or insolvent. In all other circumstances, the Agreement may be terminated by the Service Provider upon 120 days' written notice.

The final Billing Date will be the Services Termination Date. In the event of termination of the Agreement, fees will be payable through the Services Termination Date. Any amounts unpaid as of the final Invoice Date will be withheld from the Plan liquidation proceeds.

From:                                                01/28/2007 10:49     #412 P.009/013

**American Funds**

Recordkeeping and
Administrative Services Agreement

## XII. Notices

All notices to the Service Provider shall be addressed to Capital Research and Management Company, Inc.; PlanPremier Retirement Plans; 333 South Hope Street, 55th Floor; Los Angeles, CA 90071-1447, unless the Employer is otherwise notified in writing of any change. All notices to the Employer shall be sent to the address of record unless the Service Provider is otherwise notified in writing of any change. Electronic media (with return receipt) may be used to satisfy any notice requirements required by this Agreement.

## XIII. General terms

The Agreement supersedes any prior written and oral agreements, communications or negotiations between the parties, and it constitutes the complete and full agreement of the parties with regard to the services to be provided pursuant to the Agreement (except as otherwise provided in an exhibit or addendum to the Agreement). The parties agree that the Plan is not a party to the Agreement. None of the provisions of the Agreement shall be for the benefit of, or enforceable by, any person (other than the Employer and the Service Provider and its affiliates or agents) including, without limitation, the Plan and any participant or any beneficiary covered by the Plan. The Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all counterparts, together, constitute only one Agreement. No waiver by any party of any failure or refusal to comply with an obligation hereunder shall be deemed a waiver of any subsequent failure or refusal to so comply. The Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the respective parties. If any term or provision of the Agreement or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of the Agreement, or the application of such term or provision, to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby. Each term and provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law. The Agreement shall be governed by the laws of the State of California, except to the extent such laws are superseded by ERISA. Any claim, dispute, controversy or other matter arising under or related to the Agreement shall be subject to the sole and exclusive jurisdiction of the federal and state courts located in Los Angeles, California, and all parties hereby waive any claims of forum non conveniens or lack of personal jurisdiction with respect to such courts.

## XIV. Effective date

This Agreement shall be effective as of the date signed by the Employer.

In witness whereof, the parties hereto have caused this Agreement to be executed by their duly authorized officers.

TRADER JOE'S COMPANY
Print Name of Employer or Plan Sponsor

By X _Mary Genest_
Authorized Signer

Name  MARY GENEST
Print name of Authorized Signer

Title  SECRETARY + TREASURER

Date  1-29-07

By X _____
Additional Authorized Signer (if applicable)

Name _____
Print name of Authorized Signer

Title _____

Date _____

CAPITAL RESEARCH AND MANAGEMENT COMPANY
SERVICE PROVIDER

By _Denise Cassin_
Authorized Officer

Name Denise Cassin
Print name of Authorized Signer

Title Senior Vice President

RECEIVED TIME   JAN. 29.   10:10AM

From:                                                              01/29/2007 10:50     #412 P.010/013

 American Funds®

Recordkeeping and
Administrative Services Agreement

## Exhibit A: Recordkeeping and Administrative Services

The Service Provider will provide the following recordkeeping and administrative services under the Agreement:

### Installation

1. A Plan Installation Checklist and Investment Authorization Form for approval by the Employer.
2. A Prototype Plan Document and Adoption Agreement completed in accordance with the Employer's instructions for review by the Employer's legal adviser.
3. A Summary Plan Description for prototype users.
4. Preparation of IRS Form 5307 filing for prototype users.
5. An Administration Manual to facilitate transactions relating to the administration of the Plan.
6. Asset reconciliation of transferred assets with participant data for transferred plans.

### Recordkeeping

1. Access to the Plan Service Center (PSC) to facilitate the transmission of participant and contribution data. Processing and allocating payroll deductions, Employer contributions and rollover contributions to participants' accounts via PSC. Processing name, address and other indicative data changes submitted by the Employer via PSC.
2. A voice response system (VRS) with customer service representatives available during normal business hours, initiation of participant loans and participant-directed transfers between investment options via VRS or customer service representatives.
3. Production of the following reports:
   a. Quarterly Participant Statements
   b. Quarterly Plan Sponsor Reports
   c. Annual Plan Summary Report
   d. Transaction Confirmations
4. A website accessible to Plan participants to review account information and execute transactions.
5. Tracking of participant-vested percentages.
6. Maintenance of amounts eligible for participant loans and/or hardship withdrawals.

### Compliance testing

1. Annually, following the close of each Plan year, determination of the average deferral percentage (ADP) test, as required by Internal Revenue Code (IRC) section 401(k) and the average contribution percentage (ACP) test as required by IRC section 401(m), if applicable.
2. Preparation of alternatives to correct failed ADP and/or ACP tests.
3. Determination of excess contributions, including excesses under 401(k), 401(m) and 402(g); preparation of communications to participants regarding excesses and processing corrections to excesses.

### Compliance testing (continued)

4. Annually as needed, following the close of the Plan year, determination of:
   a. minimum coverage testing under IRC section 410(b)
   b. top-heavy status under IRC section 416
   c. excess annual additions under IRC section 415
   d. compliance testing for compensation under IRC section 414(s)

In the event that the Employer has special Compliance Testing needs due to the terms of the Plan, the Employer will make a separate arrangement to have all Compliance Testing provided by an entity other than the Service Provider and will notify the Service Provider in writing of the arrangement. Upon receipt of such notice by the Service Provider, Compliance Testing will not be provided with respect to the Plan.

In the event that the Employer sponsors more than one Plan, and the Service Provider is not providing recordkeeping and administrative services for all Plans of the Employer, then Compliance Testing will only be provided with respect to the Plan or Plans for which services are provided under this Agreement.

### Administration

1. Reconciliation of trust assets with participant accounts.
2. Tracking forfeitures of nonvested amounts, as applicable.
3. Preparation of IRS Form 5500 series with supporting forms and schedules annually, for review, signature and filing by the Employer.*
4. Preparation of Summary Annual Reports.*
5. Preparation of certified copy of the trust statement.
6. Calculation of required minimum distribution amounts as requested.
7. For prototype users, preparation of Plan amendments, preparation of Summary of Material Modifications and new Summary Plan Description as needed. Assistance with IRS determination letter filings as needed for prototype amendments. Assistance with IRS determination letter filings (Form 5310) (additional fee), in the event of Plan termination. There may be additional charges for Plan amendments.
8. Processing participant withdrawals at the Employer's direction, including applicable federal withholding and mandatory state withholding, preparation of Form 1099-R, and withholding tax remittance and reporting.
9. Review and processing of QDRO distributions at the direction of the Employer.
10. Preparation and maintenance of participant loan documents and processing of loan distributions.

*Service Provider will not prepare the Form 5500 series (with supporting forms and schedules) and Summary Annual Report, if notified by the Employer in writing that such service is not required.

From:                                          01/29/2007 10:50      #412 P.011/013



Recordkeeping and
Administrative Services Agreement

## Exhibit B: Fee Schedule

**One-time setup fee**
Start-up plan    $1,000
Takeover plan    $1,750
Includes Plan installation/conversion, prototype document and enrollment materials

**Standard ongoing fees**

| Number of participants with account balances | Base fee | | Per participant |
|---|---|---|---|
| 1 - 25 | $5,400 | + | $100 |
| 26 - 300 | $5,400 | + | $60 |
| 301 - 500 | $6,900 | + | $55 |
| 501 - 1,000 | $9,650 | + | $50 |
| Over 1,000 | $11,650 | + | $48 |

*Fees shown above include an annual trustee fee of $750.*

**Ancillary fees**

*Document services*

| Plan amendments (prototype document only) | $350 per amendment |
|---|---|
| Letter of Determination filing – IRS Form 5307 (nonstandardized prototype only) | $500 plus IRS user fee to be paid by the Employer |
| Letter of Determination filing for Plan termination – IRS Form 5310 | $500 plus IRS user fee to be paid by the Employer |

*Plan services*

| Participant indicative data received in nonautomated format | $10 per participant |
|---|---|
| Participant allocations only received in nonautomated format | $85 per hour (during conversion) $4 per participant (post-conversion) |
| Reconciliation in excess of four hours on takeover plans if data not received in good order | $85 per hour |
| Plan merger | $850 for two plans merging, increasing by $850 for each additional plan being merged |
| Employer stock (publicly traded, preapproval required) | $3,750 annually Does not include custodial fees |
| Self-directed brokerage | $2,000 annually |
| Administration of illiquid assets (preapproval required) | $1,000 per option annually |

RECEIVED TIME  JAN. 29.  10:10AM


**American Funds**

Recordkeeping and
Administrative Services Agreement

| Support of certain Plan provisions | - Exclusion of any group of employees other than collectively bargained employees (union employees), nonunion employees, nonresident aliens and highly compensated employees<br>- Nonstatutory exclusion of items from compensation such as overtime, commissions, bonuses, etc.<br>- Match formula based on years of service or tiered match formula where the match amount increases as the deferral percentage increases<br>- Use of a last day and/or 1,000 hour requirement to determine eligibility for Employer contributions if Plan fails minimum coverage testing (410(b) test)<br>- Profit-sharing formula based upon a uniform points allocation or service<br>- Different vesting schedules for two or more employee groups on the same money type<br><br>Number of provisions utilized from list above:  Additional annual fee:<br>  1                  $500<br>  2                  $1,000<br>  3 to 5             $1,500<br>  6 or more          $2,000<br>*Certain additional provisions may be subject to these fees.* |
|---|---|
| Miscellaneous service such as:<br>- Calculation of Employer allocations<br>- Forfeiture reallocations<br>- Assistance to Plan auditors beyond standard audit package<br>- Rerun of tests due to inaccurate/revised data from Plan Sponsor<br>- Correction of failed tests by means other than issuing refunds<br>- Additional test for ADP/ACP compliance<br>- Loan corrections<br>- Calculation of lost earnings for late deposits of elective deferrals and/or loan repayments or for missed Employer contributions | $85 per hour |
| Maintaining beneficiary information | $1 per participant annually<br>(Charge applies to any participant with an account balance regardless of whether a beneficiary has been designated.) |
| Automatic enrollment annual notification mailing | $0.75 per letter |
| Enrollment books mailed to employee homes | Applicable postage |

From:                                                              01/29/2007 10:50      #412 P.013/013



Recordkeeping and
Administrative Services Agreement

*Participant services*

| Loan fees<br>■ Origination<br>■ Maintenance | $50 one-time deduction from loan amount<br>$25 annually, deducted quarterly from account (may be charged to the Employer) |
|---|---|
| Periodic payments<br>■ Setup<br>■ Maintenance | $50 one-time deduction from account<br>Monthly/quarterly payments: $25 annually, deducted quarterly from account<br>Semi-annual/annual payments: $10 annually, deducted quarterly from account |
| Overnight checks | $25 taken from distribution amount |
| Self-directed brokerage | $100 annually per user, deducted quarterly from account (may be charged to the Employer)<br>All commissions/transaction fees assessed against participant's self-directed brokerage account |

**Credit rates**

| Share class | Annual credit rate |
|---|---|
| R-2 | 0.45% |
| R-3 | 0.30% |
| R-4 | 0.15% |
| R-5 | varies based on underlying investments |

Credit amounts are determined by applying the appropriate rate shown above to the average daily balance of Eligible Assets for the appropriate calendar quarter. Eligible Assets mean total Plan assets (including assets invested in the American Funds and other mutual funds or investment options approved for use by Service Provider), excluding (1) assets held in self-directed brokerage accounts; (2) Employer stock; and (3) any other investment option not approved for use by the Service Provider.

RECEIVED TIME   JAN. 29.  10:10AM

# EXHIBIT B

# ARTICLE XIII

# CLAIM PROCEDURE

Section 13.1. Claim Procedure.

    (a)    The following procedures apply with respect to general claims for benefits under the Plan:

    (1)    The claimant shall make a written application for benefits under the Plan. For purposes of such written application, the Committee or its delegate shall cause to be prepared specific forms that reflect the timing and content requirements of the Plan's established administrative practices and procedures. The claimant shall complete, sign and return the appropriate forms to the Committee (or its delegate) in accordance with the timing and content requirements of the Plan's established administrative practices and procedures.

    (2)    Within a reasonable period of time, but not later than 90 days after receipt of a claim for benefits (other than disability benefits), the Committee or its delegate shall notify the claimant of any adverse benefit determination on the claim, unless special circumstances require an extension of time for processing the claim. In no event may the extension period exceed 90 days from the end of the initial 90-day period. If an extension is necessary, the Committee or its delegate shall provide the claimant with a written notice to this effect prior to the expiration of the initial 90-day period. The notice shall describe the special circumstances requiring the extension and the date by which the Committee or its delegate expects to render a determination on the claim.

(3) In the case of an adverse benefit determination, the Committee or its delegate shall provide to the claimant written or electronic notification setting forth in a manner calculated to be understood by the claimant: (i) the specific reason or reasons for the adverse benefit determination; (ii) reference to the specific Plan provisions on which the adverse benefit determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why the material or information is necessary; and (iv) a description of the Plan's claim review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse final benefit determination on review and in accordance with paragraph 6 below.

(4) Within 60 days after receipt by the claimant of notification of an adverse benefit determination, the claimant or the claimant's duly authorized representative, upon written application to the Committee, may request that the Committee fully and fairly review the adverse benefit determination. On review of an adverse benefit determination, upon request and free of charge, the claimant shall have reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim for benefits. The claimant shall have the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits. The Committee's (or delegate's) review shall take into account all comments, documents, records, and other information submitted regardless of whether the information was previously considered in the initial adverse benefit determination.

(5) The Committee or its delegate shall make a final benefit determination no later than 60 days immediately following receipt of claimant's request for review, unless special circumstances require a further extension of time for processing the claim, which extension may be up to an additional 60 days. If such an extension of time for review is required because of special circumstances, the Committee or its delegate shall provide the claimant with a written notice of the extension prior to the commencement of the extension. The notice shall describe the special circumstances requiring the extension and the date as of which the final benefit determination shall be made. The Committee or its delegate shall provide the claimant with written or electronic notification of the final benefit determination, but not later than five days after the final benefit determination is made. In the case of an adverse final benefit determination, the Committee or its delegate shall provide to the claimant written or electronic notification setting forth in a manner calculated to be understood by the claimant: (i) the specific reason or reasons for the adverse final benefit determination; (ii) reference to the specific Plan provisions on which the adverse final benefit determination is based; (iii) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim for benefits; and (iv) a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse final benefit determination on review and in accordance with paragraph 6 below.

(6) Before a claimant pursues any legal remedy including without limitation a suit for any benefits claim under the Plan, it is mandatory and necessary that the claimant use exclusively the benefits claim and review procedure described above

until this procedure is completely exhausted and an adverse final benefit determination is communicated to the claimant in writing. In addition, no lawsuit may be filed more than 180 days following the date on which the adverse final benefit determination is communicated to the claimant in writing, the determination of which date shall be in the Committee's sole and absolute discretion except that such determination shall be consistent with the terms of this benefits claim and review procedure and applicable law.

(b) The following procedures apply with respect to claims for disability benefits to the extent applicable under the Plan:

(1) The claimant shall make a written application for benefits under the Plan. For purposes of such written application, the Committee or its delegate shall cause to be prepared specific forms that reflect the timing and content requirements of the Plan's established administrative practices and procedures. The claimant shall complete, sign and return the appropriate forms to the Committee (or its delegate) in accordance with the timing and content requirements of the Plan's established administrative practices and procedures.

(2) Within a reasonable period of time, but not later than 45 days after receipt of a claim for disability benefits, the Committee or its delegate shall notify the claimant of any adverse benefit determination on the claim, unless circumstances beyond the Plan's control require an extension of time for processing the claim. In no event may the extension period exceed 30 days from the end of the initial 45-day period. If an extension is necessary, the Committee or its delegate shall provide the claimant with a written notice to this effect prior to the expiration of the initial 45-day period. The notice